UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CHARLES WILLIAMS,

Petitioner,

v.

WILLIAM KNIPP,

Respondent.

No.  2:  13-cv-1468 TLN KJN P

FINDINGS & RECOMMENDATIONS

Introduction

Petitioner is a state prisoner, proceeding without counsel, with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2011 conviction for first degree murder and various sentence enhancements, including discharge of a firearm causing death. Petitioner is serving a sentence of 50 years to life.

The petition raises one claim:  jury instruction error.  After carefully reviewing the record, the undersigned recommends that the petition be denied.

Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California,

1

1    202 F.3d 1146, 1149 (9th Cir. 2000).

2           Federal habeas corpus relief is not available for any claim decided on the merits in state

3    court proceedings unless the state court's adjudication of the claim:

4                  (1)  resulted  in  a  decision  that  was  contrary  to,  or  involved  an
                   unreasonable  application  of,  clearly  established  Federal  law,  as
5                  determined by the Supreme Court of the United States; or

6                  (2)  resulted  in  a  decision  that  was  based  on  an  unreasonable
                   determination of the facts in light of the evidence presented in the
7                  State court proceeding.

8    28 U.S.C. § 2254(d).

9           Under section 2254(d)(1), a state court decision is "contrary to" clearly established United

10   States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in

11   Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a

12   decision of the  Supreme Court and nevertheless arrives at different result.  Early v. Packer, 537

13   U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).

14          Under the  "unreasonable application" clause of section 2254(d)(1), a federal habeas court

15   may grant the writ if the state court identifies the correct governing legal principle from the

16   Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's

17   case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ simply because

18   that court concludes in its independent judgment that the relevant state-court decision applied

19   clearly established federal law erroneously or incorrectly.  Rather, that application must also be

20   unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (it is "not enough

21   that a federal habeas court, in its independent review of the legal question, is left with a 'firm

22   conviction' that the state court was 'erroneous.'") (internal citations omitted).  "A state court's

23   determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded

24   jurists could disagree' on the correctness of the state court's decision."  Harrington v. Richter,

25   131 S. Ct. 770, 786 (2011).

26          The court looks to the last reasoned state court decision as the basis for the state court

27   judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  If there is no reasoned decision,

28   "and the state court has denied relief, it may be presumed that the state court adjudicated the

2

1  claim on the merits in the absence of any indication or state-law procedural principles to the

2  contrary." Harrington, 131 S. Ct. at 784-85.  That presumption may be overcome by a showing

3  that "there is reason to think some other explanation for the state court's decision is more likely."

4  Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

5      "When a state court rejects a federal claim without expressly addressing that claim, a

6  federal habeas court must presume that the federal claim was adjudicated on the merits – but that

7  presumption can in some limited circumstances be rebutted." Johnson v. Williams, 133 S. Ct.

8  1088, 1096 (2013).  "When the evidence leads very clearly to the conclusion that a federal claim

9  was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to" de novo review of

10  the claim. Id., at 1097.

11      Where the state court reaches a decision on the merits but provides no reasoning to

12  support its conclusion, the federal court conducts an independent review of the record.

13  "Independent review of the record is not de novo review of the constitutional issue, but rather, the

14  only method by which we can determine whether a silent state court decision is objectively

15  unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  Where no reasoned

16  decision is available, the habeas petitioner has the burden of "showing there was no reasonable

17  basis for the state court to deny relief." Harrington, 131 S. Ct. at 784.  "[A] habeas court must

18  determine what arguments or theories supported or, . . . could have supported, the state court's

19  decision; and then it must ask whether it is possible fairminded jurists could disagree that those

20  arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. at

21  786.

22  Factual Background

23      The opinion of the California Court of Appeal contains a factual summary.  After

24  independently reviewing the record, the undersigned finds this summary to be accurate and

25  adopts it herein.

26              Prosecution Case–in–Chief

27              In May 2010, Marcel Hatch lived with Ashanti Lewis and
            Dominique Phillips. Hatch was a pimp; Lewis was one of his
28              prostitutes, and Phillips was his girlfriend and a former prostitute.

3

Hatch's prostitution business was located at a motel on Auburn Boulevard in Sacramento.

On May 6, 2010, Hatch spit at prostitute Candence Mays FN1 and fired his gun in the air. Defendant was Candence's pimp and her boyfriend. The next day, defendant went to the motel to confront Hatch about the incident. They got into a fight over their "sweating" of each other's prostitutes.FN2 Hatch beat defendant severely and then took defendant's cellular telephone and other items. Thereafter, defendant picked himself up and drove away. At home that night, his face was swollen and he was crying. He told Candence that Hatch had taken his cellular telephone, a radio, and a television out of defendant's car.

FN1. For clarity, we refer to members of the Mays family by their first names.

FN2. "Sweating" is a means of recruiting another pimp's personnel, that is, his prostitutes. Hatch and defendant were competing pimps and "sweaters."

The following day, May 8, 2010, defendant and Candence went to her parents' home in North Highlands. Candence's brothers Demetrius, Lorenzo, and Kenyatta were present. Defendant's face was still visibly injured from the beating. The brothers asked who had injured him and encouraged him to "do something to" the perpetrator. Candence did not hear defendant make any response.

After they talked a while, defendant, the brothers, their sister Brandy, and Demetrius's girlfriend Jenna left in Brandy's sport utility vehicle (SUV). They arrived at the motel around 4:00 or 5:00 p.m., entered the driveway and drove past prostitute Lewis, who was standing outside her motel room door at the time. Lewis exchanged glances with the occupants of the SUV as it passed. Lewis initially thought the SUV carried a potential "date." The occupants of the SUV drove to the end of the motel, made a U-turn, and came back. Defendant was looking for Hatch, and he recognized Lewis as one of Hatch's prostitutes. Hatch was not at the motel at the time, so the occupants of the SUV drove off and returned to North Highlands.

About a half hour later, defendant, Demetrius, Kenyatta, Lorenzo, and Brandy left again, with Brandy driving the SUV. Demetrius had a "long gun," his father's AK–47, which he had retrieved from the house before they left the second time. Lorenzo had a small gun with him. They went back to the motel. Meanwhile, Hatch had returned to the motel around 6:00 p.m. Lewis was in a room with a customer when she heard several gunshots. She looked out the window through the blinds and saw the SUV. She saw defendant in the SUV with a big gun in his hand, drawing it back through the window. She saw him shooting in the direction of Hatch.

Defendant fired additional shots, and Hatch came running toward Lewis's room. Apparently, defendant fired 10 shots in all. Hatch told Lewis to call 911 because he had been shot. Defendant shouted

4

two or three times, "[W]hat now, nigga, what now?" Hatch told Lewis, "[T]hat nigga came back" and he (Hatch) had "been hit." Hatch explained he had been shot in the arm and "ass." Lewis removed Hatch's clothes to see where the wounds were located. Meanwhile, the occupants of the SUV drove off and returned to North Highlands.

Emergency and law enforcement personnel arrived at the motel. Hatch was taken to a hospital where he died two days later.FN3

FN3. Testimony by the pathologist who performed the autopsy concluded the gunshot wounds inflicted on the deceased were consistent with coming from an AK–47, a high velocity assault rifle. The entrance wounds were small and the exit wounds were large and gaping. The entrance wounds appeared to have come from behind the deceased. Death was due to complications caused by one of the gunshot wounds.

At the scene, officers found 10 expended shell casings consistent with having come from an AK–47. Bullet holes were found in the motel near where Lewis had been and in a car parked outside.

The day after the shooting, defendant called Hatch's cellular telephone number. Dominique Phillips, who had programmed her own cell telephone to receive Hatch's calls, did not answer although she recognized the number of the incoming call was defendant's. However, she called the number back, muted her phone, and overheard a conversation involving the defendant. She heard him declare he had "already laid one pussy nigga down and he don't want to have to lay another nigga down again." Without speaking, Phillips hung up the phone.

Defendant was arrested on May 11, 2010, three days after the shooting.

Defense

Defendant appeared in propria persona at trial. Although active throughout the trial, he rested his case without presenting evidence or testimony.

(ECF No. 10-1 at 3-6.)

Analysis

The California Court of Appeal is the last state court to issue a reasoned decision addressing petitioner's claim. Accordingly, the undersigned considers whether the denial of this claim by the California Court of Appeal was an unreasonable application of clearly established Supreme Court authority.

////

5

The California Court of Appeal denied petitioner's claim for the reasons stated herein:

Defendant contends the trial court had a duty to instruct the jury sua sponte on the lesser included offense of voluntary manslaughter. Because it did not do so, defendant says we must reverse his murder conviction. He claims there was sufficient evidence that he acted "upon a sudden quarrel or heat of passion," and thus the court was required to give the instruction. We are not persuaded. FN4

FN4. Before the close of the prosecution case, the trial court commented, "I'm not sure, based on anything I have heard yet, that a voluntary manslaughter or involuntary manslaughter [instruction] would be appropriate, so I wouldn't on my own at this point be prepared to give those, but again, that would be something I would want your input on." The Attorney General notes that "[n]o one disagreed" with the court, and "no such evidence was introduced after this discussion." We do not construe the Attorney General's remarks as suggesting defendant forfeited his contention. We consider the contention on its merits.

""The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request.'" [Citation.] "Conversely, even on request, the court 'has no duty to instruct on any lesser offense unless there is substantial evidence to support such instruction.'" [Citation.] This substantial evidence requirement is not satisfied by "'any evidence ... no matter how weak,'" but rather by evidence from which a jury composed of reasonable persons could conclude "that the lesser offense, but not the greater, was committed." [Citation .] "On appeal, we review independently the question whether the trial court failed to instruct on a lesser included offense." [Citation.]' [Citation.]

"'Manslaughter, an unlawful killing without malice, is a lesser included offense of murder." [Citations.] "Although section 192, subdivision (a), refers to 'sudden quarrel or heat of passion,' the factor which distinguishes the 'heat of passion' form of voluntary manslaughter from murder is provocation." [Citations.] "The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim." [Citation.] "[T]he victim must taunt the defendant or otherwise initiate the provocation." [Citations.] The "'heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances....'" [Citation.]' [Citation.]" (People v. Verdugo (2010) 50 Cal.4th 263, 293, italics omitted.)

"'[T]he passion aroused need not be anger or rage, but can be any """violent, intense, high-wrought or enthusiastic emotion""" [citations] other than revenge [citation].' [Citation.]" (People v. Lujan (2001) 92 Cal.App.4th 1389, 1411, italics added .)

"'[I]f sufficient time has elapsed for the passions of an ordinarily reasonable person to cool, the killing is murder, not manslaughter.'"

Citation.]" ( <u>People v. Avila</u> (2009) 46 Cal.4th 680, 705.)

Ignoring context and their mutual "sweating" of one another's prostitutes, defendant claims there is "no doubt that the acts committed by Marcel Hatch in the days prior to his being shot constituted provocation that 'would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection.'" (Quoting <u>People v. Lee</u> (1999) 20 Cal.4th 47, 59.)

The Attorney General counters that there was "*no* evidence that [defendant] was in a heat of passion at the time of the shooting; indeed, there was no evidence of any state of mind, except the desire for revenge." (Original italics.) The Attorney General is correct. That is what the record demonstrates.

The Mays brothers' statements just before the first SUV trip to the motel supplied unmistakable evidence of defendant's desire for revenge. According to Candence, the brothers encouraged defendant to seek revenge, stating, "[W]ho did that? You should go back and do something to him. Why he do [ sic ] that to you? Why would he do that?"

According to Candence's sister Vnelsia, the brothers said, "[L]et's go fight the dude that did that to you." Although neither Candence nor Vnelsia heard defendant respond verbally to the brothers' encouragement, they saw them depart in the SUV. During the second trip to the motel, defendant voluntarily did just what the brothers had encouraged him to do; he did something to Hatch. Thus, the evidence supports the singular inference defendant was motivated by his desire for revenge.

No evidence suggested defendant acted rashly, without due reflection, or in response to Hatch's "provocation," that is, his conduct from the day before, as opposed to importuning by Candence's family. Rather, evidence showed defendant shouted, "[W]hat now nigga, what now" as he shot a fleeing Hatch in the rear with an AK–47 during a second drive-by, the day after the beating, following encouragement from Candence's family. (<u>See</u> <u>People v. Lee</u>, <u>supra</u>, 20 Cal.4th at p. 59.)

<u>People v. Berry</u> (1976) 18 Cal.3d 509, on which defendant relies, is distinguishable because expert and other evidence showed that the defendant in that case "killed in a state of uncontrollable rage" following a "long course of provocatory conduct." (<u>Id.</u> at p. 516.) No comparable evidence was presented here.

Nor did the evidence presented here affirmatively suggest defendant would have acted at all, but for the encouragement of Candence's family members who furnished the AK–47, the SUV, and the driver.FN5 The family effectively used defendant as a willing tool to avenge Hatch's spitting upon Candence, as well as his beating of defendant.

FN5. According to the probation report, Brandy, Demetrius, Kenyatta, and Lorenzo were charged with first degree murder in

7

separate complaints. None of them is a party to this appeal.

Confirmation came but a day after the shooting when defendant was heard to boast he had "already laid one pussy nigga down and he don't want to have to lay another nigga down again."

Because defendant's state of mind, i.e., his desire for revenge, does not support a voluntary manslaughter instruction (People v. Lujan, supra, 92 Cal.App.4th at p. 1411), and no evidence showed "'any "'"violent,      intense,      high-wrought      or      enthusiastic emotion"'"[citations] other than revenge'" (ibid.), there is simply no evidence in this record to raise a triable issue whether any ostensible passion had cooled in the hours preceding the shooting. Nor does the record contain "'"substantial evidence ... from which a jury composed of reasonable persons could conclude "that the lesser offense, but not the greater, was committed."'" (People v. Verdugo, supra, 50 Cal.4th at p. 293.)

Alternatively, the total absence of evidence of passion and the indisputable presence of evidence of defendant's desire for revenge leaves no room for an inference he could have fared any better had a voluntary manslaughter instruction been given. (People v. Breverman (1998) 19 Cal.4th 142, 165; People v. Watson (1956) 46 Cal.2d 818, 836.) Defendant's assertion that the Breverman standard of prejudice is inapplicable for reasons stated in Justice Kennard's dissent must be addressed elsewhere. (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455.)

(ECF No. 10-1 at 6-11.)

Jury instruction issues are generally matters of state law for which federal habeas relief is not available. Estelle v. McGuire, 502 U.S. 62, 67–68 (1991). A federal habeas court does not review jury instructions to determine whether they violate state law, as federal habeas relief "does not lie for errors of state law." Lewis v. Jeffers, 497 U.S. 764, 780 (1990). Further, the Ninth Circuit has repeatedly held that a claim of error based on the failure to give a lesser included offense instruction in a non-capital criminal case "fails to present a federal constitutional question and will not be considered in a federal habeas corpus proceeding." Solis v. Garcia, 219 F.3d 922, 929 (9th Cir.2000) (quoting Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984)).

As a limited exception to this rule, the "refusal by a court to instruct a jury on lesser included offenses, when those offenses are consistent with defendant's theory of the case" and are supported by substantial evidence, may raise a cognizable constitutional claim. Solis, 219 F.3d at 929. However, to obtain federal habeas relief on these grounds, petitioner must demonstrate both that the jury was precluded from considering a sound theory of the case and that the jury's non-

8

1    consideration of that theory had a substantial and injurious effect on the verdict within the

2    meaning of <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993).  <u>Clark v. Brown</u>, 450 F.3d 898, 905

3    (9th Cir. 2006) (applying <u>Brecht</u> "substantial and injurious effect" standard to claim of

4    instructional error); <u>see also</u> <u>Cudjo v. Ayers</u>, 698 F.3d 752, 768 (9th Cir. 2012) (applying <u>Brecht</u>

5    standard to a violation of the petitioner's right to present a defense).

6          For the reasons stated by the California Court of Appeal, the undersigned finds that the

7    trial court's failure to sua sponte instruct the jury as to voluntary manslaughter did not have a

8    substantial and injurious effect on the jury.  As noted by the California Court of Appeal, the

9    evidence demonstrated that petitioner was motivated to shoot the victim out of revenge for the

10   earlier beating, which does not reduce murder to manslaughter.  <u>People v. Cole</u>, 33 Cal.4th 1158,

11   1216 (2004).

12         Moreover, the evidence did not demonstrate that petitioner acted rashly or without due

13   deliberation and reflection.  <u>See</u> <u>People v. Lee</u>, 20 Cal.4th 47, 59 (1999).  Petitioner shot the

14   victim the day after the beating and during the second drive-by.  At the time of the shooting,

15   petitioner also taunted the victim.  These circumstances did not support a voluntary manslaughter

16   instruction.

17         The outcome of the trial would not have been different had a voluntary manslaughter

18   instruction been given.  For these reasons, the undersigned finds that the denial of this claim by

19   the California Court of Appeal was not an unreasonable application of clearly established

20   Supreme Court authority.

21         Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

22   habeas corpus be denied.

23         These findings and recommendations are submitted to the United States District Judge

24   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

25   after being served with these findings and recommendations, any party may file written

26   objections with the court and serve a copy on all parties.  Such a document should be captioned

27   "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,

28   he shall also address whether a certificate of appealability should issue and, if so, why and as to

1   which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the

2   applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. §

3   2253(c)(3).  Any response to the objections shall be served and filed within fourteen days after

4   service of the objections.  The parties are advised that failure to file objections within the

5   specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951

6   F.2d 1153 (9th Cir. 1991).

7   Dated:  February 18, 2014

8

9   will1468.157

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

10